[Crim. No. 8759.   Second Dist., Div. One.   Dec. 2, 1963.]

THE PEOPLE, Plaintiff and Respondent, v. SAM BURTON
LONGINO, Defendant and Appellant.

Miles J. Rubin, under appointment by the District Court
of Appeal, for Defendant and Appellant.

Stanley Mosk, Attorney General, William E. James, As-
sistant Attorney General, and S. Clark Moore, Deputy Attor-
ney General, for Plaintiff and Respondent.

LILLIE, J.—Defendant was convicted by a jury of offer-
ing to sell marijuana.  He appeals from the judgment.

The People's case consists of the testimony of two police
officers. On June 4, 1962, around 2 p.m. Officer Wiggs, work-
ing undercover for the narcotics detail, was driving around
with one Armstrong and Smiley "just looking for anybody

that you might get to sell you narcotics.'' At 96th and Antwerp, Armstrong left the car, went to another automobile and in a few minutes returned with defendant, who was then unknown to Wiggs. Referring to him, Armstrong said to Wiggs, ''My man here will be able to cop a half-can for you''; Wiggs asked defendant if he could get a half-can and he replied ''yes'' but that they would have to go to 87th and Ivy. On the way defendant asked him to stop at a store so he could buy some cigarettes. When he returned defendant said he had made a telephone call to his man and that they would have to wait ten minutes; Wiggs asked the reason for the delay and defendant said ''he'' had to go and get it. Wiggs then asked defendant if he had to pay the money in advance; he replied: ''Yes you do. Any time you score you got to put your lace out front.'' Wiggs complained that he was expected to pay $7.50 and he ''didn't know defendant from Adam.'' After some discussion Armstrong said that Wiggs could trust ''Bull,'' referring to defendant, and that if he did not return with the money he would be responsible. Wiggs then asked defendant for some security; defendant said he had none and was only doing him a favor and would get nothing out of the deal except maybe a few cigarettes. Wiggs gave defendant a $5.00 bill, two $1.00 bills and two quarters, and said, ''Listen, now, I am going to give you my seven-fifty, but I want you back here with the stuff within ten minutes or I am coming and look for you.'' Defendant left the car at 87th and Ivy; it was then around 2:20 p.m.; they waited 45 minutes for him but he did not return. Armstrong and Wiggs then went to an address on Ivy where they found him; asked about the delay, defendant said his man had not yet come. Armstrong and Wiggs returned to the car and waited until 3:45 p.m.; when defendant did not appear they went back to the house but defendant had gone. They went to an address on Antwerp to look for him, then returned to the location and searched but could not find defendant. They left around 5:15 p.m. A week later Wiggs went to defendant's apartment; he asked about the marijuana. Defendant said he (Wiggs) had not waited long enough, that the man came and gave him the marijuana, and that he used it, but he would reimburse him. Defendant at no time ever delivered to Wiggs either the marijuana or money. Upon his arrest, defendant denied that any ''stuff'' was involved and, when asked what happened, he said: ''Well, I just took his money and left and I didn't come back ... he

gave me the money to go buy the narcotics and I kept going.'' He said Wiggs was an ''easy mark'' and ''... I wasn't going to let him get me mixed up in no — (sales).''

The defendant testified that in the latter part of June he was employed and was at his brother's house when he saw Armstrong and Wiggs in an automobile and asked Armstrong if he could get a ride home; that when he got into the car Wiggs asked Armstrong if he (defendant) could score some narcotics for him and Armstrong told Wiggs to ask him (defendant) himself; that Wiggs then asked him if he knew where he could buy some marijuana and he said he did not know; that he was only interested in ''getting a lift home''; that Wiggs persisted in talking about buying marijuana; that at 87th and Ivy he asked Wiggs if he could stop at the store for cigarettes; that Wiggs kept talking about marijuana and finally told him that Armstrong had said that he (defendant) might score some for him; that finally he said: ''Well, I may know someone''; that at 87th and Ivy he started to get out and the officer said: ''Oh, you're not going to buy the narcotics for me'' and Armstrong said, ''Well, he'll do it''; that he returned to the car and Wiggs handed him $7.50; that he took the money with the intention of keeping it and had no intention of getting any narcotics; that he was going to keep the money and had never sold narcotics to anyone; that instead of returning to the car he went home with the money but did not buy narcotics with it; that he was not then a user; and that he did not see them again that day, but approximately two weeks later Wiggs, whom he now knew to be an officer, came to his apartment on Ivy and asked about the money. He denied that he ever told Wiggs that his man would be able ''to cop a half-can'' for him, or that he had called ''his man'' and they would have to wait about 10 minutes, or that he ever asked Wiggs for the $7.50.

Appellant claims that the trial court erred in failing to give an instruction to the jury ''that commission of the crime of offering to sell marijuana requires the specific intent to sell such marijuana'' (A.O.B., p. 11), which the court had a duty to give on its own motion.

The trial judge properly instructed the jury on the offense[1] and on the necessity for the union of conduct and

---

[1]''Every person who offers to sell, furnish or give away a narcotic in this state is guilty of a crime. Marijuana is a narcotic.''

intent and the definition of general criminal intent,[2] but gave no instruction on the issue of specific intent—that intent necessary to constitute the commission of the crime of offering to sell narcotics.

It is the rule that "a specific intent to sell a narcotic is an essential element of the crime of offering to make such a sale under [Health & Saf. Code] section 11501." (*People* v. *Brown*, 55 Cal.2d 64, 68 [9 Cal.Rptr. 816, 357 P.2d 1072]; *People* v. *Jackson*, 59 Cal.2d 468, 470 [30 Cal.Rptr. 329, 381 P.2d 1].) In the *Jackson* case, 59 Cal.2d 468, the facts are similar to those at bar although somewhat weaker on the issue of intent; defendant therein declined to testify. Jackson took $20 from an officer and left ostensibly to "get the stuff"; he returned telling the officer he had made a contact, left again and never came back; when the officer next saw him, Jackson denied knowing him, brandished a knife and walked away. The trial court gave an instruction to the jury in part stating that " '. . . it is not necessary for the prosecution to prove that the defendants ever intended to perform the offered act. It is no defense to the crime charged herein that there exists in the mind of the person who makes an offer to sell heroin an unexpressed intention never to perform the offered act.' " Inasmuch as the jury could have reasonably concluded that defendant's offer to sell narcotics was made without intent to perform, the court held the instruction to be erroneous because it stated that the only intent required is the intent to make an offer and that a specific intent to make a sale is not necessary. Citing *People* v. *Brown*, 55 Cal.2d 64 [9 Cal.Rptr. 816, 357 P.2d 1072], to the effect that a specific intent to sell a narcotic is an essential

[2]"An essential element of the crime of which the defendant is accused is intent, the law requiring that to constitute such a crime there must exist a union or joint operation of criminal conduct and criminal intent. However, that does not mean that one must intend all the consequences of his conduct, or that he must know that such conduct is unlawful, to be guilty of a public offense such as that charged against the defendant in this case. The intent to do the forbidden thing constitutes the criminal intent. The law requires that to be guilty of crime, one must intend the conduct that fits the description of the crime and must engage in that conduct knowingly and wilfully.

"To constitute criminal intent it is not necessary that there should exist an intent to violate the law or to do a wrong. Criminal intent exists whenever a person intentionally does that which the law declares to be a crime, even though he may not know that he is committing a crime or that his act is wrong."

element of the crime of offering to make such a sale, the court said at page 470: "Persons who offer to sell narcotics with no intention of performing are not engaged in narcotics traffic. Their behavior is not materially different from that of other 'bunco' offenders and is not subject to the severe penalties imposed by section 11501. (Compare Pen. Code, §§ 532, 490.)"

The People's evidence shows that defendant took the $7.50 from the officer, who was looking for anyone who would sell him marijuana, ostensibly to buy the narcotic for him; that defendant left and did not return with either the money or the marijuana; that when the officer finally found him defendant gave him a "stall" and then disappeared; that when the officer finally found defendant a week later, he alibied that he had not waited long enough and would return the $7.50; and that upon his arrest he said he thought the officer to be an "easy mark," took the money without intention of buying narcotics, and did not want to involve himself in a sale. Unlike in the *Jackson* case, *supra*, defendant took the stand and testified concerning his intent—he said he took the money with intent to keep it and without any intention of securing narcotics. Even more so than in *People* v. *Jackson, supra,* 59 Cal.2d 468, the jury could have reasonably concluded that defendant's "offer" to sell marijuana was made, and he took the $7.50, without any intention of actually performing; and inasmuch as the *Jackson* case holds that a specific intent to sell a narcotic is an essential element in the crime of offering to make such a sale, the jury should have been so instructed. The instructions on general criminal intent do not suffice.

It is the duty of the trial court to give instructions on general principles of law governing the case even though not requested by the parties. "The most rational interpretation of the phrase 'general principles of law governing the case' would seem to be those principles of law commonly or closely and openly connected with the facts of the case before the court." (*People* v. *Bevins*, 54 Cal.2d 71, 77 [4 Cal.Rptr. 504, 351 P.2d 776]; *People* v. *Wade*, 53 Cal.2d 322 [1 Cal.Rptr. 683, 348 P.2d 116]; *People* v. *Baker*, 42 Cal.2d 550 [268 P.2d 705]; *People* v. *Yrigoyen*, 45 Cal.2d 46 [286 P.2d 1].) Thus the failure to give a proper instruction on specific intent was substantial error and prejudicial, for considering the entire record it cannot be said that under correct instructions a different verdict would have

739

been improbable. (*People* v. *Hamilton*, 33 Cal.2d 45 [198 P.2d 873].)

For the foregoing reasons the judgment is reversed.

Wood, P. J., and Fourt, J., concurred.